# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**UNITED STATES OF AMERICA**                                                          **PLAINTIFF**

**v.**                                        **No. 4:12-cr-00205 KGB**

**RAYMOND DEMILIA and**
**JEROME DERRICK**                                                                **DEFENDANTS**

### OPINION AND ORDER

Defendant Raymond Demilia filed a motion to suppress evidence obtained as a result of a traffic stop and search he contends was illegal (Dkt. No. 61).  Defendant Jerome Derrick filed a motion to suppress and to join in Mr. Demilia's motion (Dkt. No. 78).  The government responded to both motions (Dkt. Nos. 63, 79).  Specifically, defendants seek to suppress marijuana discovered in a recreational vehicle ("RV").  At the time of the traffic stop at issue, Mr. Demilia was driving the RV, and Mr. Derrick was a passenger in the vehicle.  Mr. Demilia premises his motion on three alleged violations of his constitutional rights:  (1) there was no initial probable cause that Mr. Demilia was committing a traffic violation so as to justify the ensuing traffic stop; (2) the officer lacked the requisite reasonable suspicion of further illegal activity to justify the expansion of the detainment and questioning beyond the alleged traffic violation; and (3) Mr. Demilia did not voluntarily consent to the officer's search of the RV, making the subsequent search unconstitutional.  Mr. Demilia also contends that the evidence should be suppressed as "fruit of the poisonous tree," as there was no intervening circumstance to purge the taint.

The Court conducted a hearing on the motions, taking testimony and hearing arguments. After the hearing, defendants submitted a post-hearing brief (Dkt. No. 82).  The government filed

a motion to supplement the record (Dkt. No. 83), and defendants responded in opposition to the government's motion (Dkt. Nos. 84, 85).

## A.    Factual Background

At the hearing the Court conducted on defendants' motion, the government introduced several exhibits including the video recording of the traffic stop. The government also presented testimony from Arkansas State Police Corporal Victor Coleman. Corporal Coleman has 27 years of law enforcement experience. He has attended training sessions sponsored by the Arkansas State Police, conferences conducted around the state, training with U.S. Border Patrol and Customs in reference to compartments and concealments in vehicles, and programs sponsored by the California Highway Patrol, including programs specific to training on compartments and concealments in vehicles. He also teaches interdiction techniques and works with other law enforcement agencies. Since 2005, he generally has worked an interstate criminal patrol, which means he usually is part of a two-man team with a canine charged with actively pursuing criminal activity on the interstate. In his 27 years with the Arkansas State Police, he has made approximately 50,000 traffic stops. He estimated that in excess of approximately 100 stops have turned into drug interdiction stops.

On July 17, 2012, Corporal Coleman was on duty alone. He did not have a canine. He was working patrol on Interstate 40 at approximately the 177 mile marker. He saw defendants' RV on the road, heading Eastbound, in the right lane. Corporal Coleman testified that he observed the RV go off the right side of the road and cross onto the fog line; he also claims he heard the RV on the rumble strip. He testified that the fog line is approximately six to eight inches wide, with the rumble strip beginning at the outer edge of the fog line. He claims that the RV first crossed onto the fog line around mile marker 181 or 182, that it then came back onto the

road, but that it crossed over onto the fog line again. Corporal Coleman testified that, in his opinion, what he observed was a violation of Arkansas traffic laws. Mr. Demilia contends that Corporal Coleman characterized the alleged violation as "lane use," which is not a violation of Arkansas law. Corporal Coleman was questioned by counsel for the government and testified that he relied on Ark. Code Ann. § 27-68-103 to make the stop.

Corporal Coleman testified that, at approximately mile marker 184, he turned on the blue lights in his patrol car. He drove his patrol car behind the RV in the right lane. The Court understands that, when the blue lights are activated, the center-mounted dashboard camera in the patrol car activates, begins to film, and, in fact, captures approximately one minute of activity prior to the blue lights being activated. Corporal Coleman testified that the RV crossed over onto the fog line again when he had the blue lights in his patrol car activated. He did not, however, note that particular cross of the fog line in his report, claiming that it was just an observation on the video after he initiated the traffic stop or blue lights.

Corporal Coleman testified that the RV did not respond to the blue lights on his patrol car, so he crossed the center line in his patrol car, moving into the left lane, and activated his siren. At that point, the RV pulled over to the right onto the shoulder of Interstate 40. In its response to the motion to suppress, the government contends that Corporal Coleman conducted the traffic stop of the RV "for driving over the white line and onto the highway shoulder on two (2) occasions in violation of Arkansas Code Annotated, Section 27-51-302 and/or Section 27-68-103" (Dkt. No. 63 at 1).

At the time of the stop, Mr. Demilia exited the RV and accompanied Corporal Coleman into his patrol car. The government contends that Corporal Coleman told Mr. Demilia he "had stopped the motor home to make sure that 'everything was okay.'" (Dkt. No. 63 at 2). On the

stand, Corporal Coleman agreed that he told Mr. Demilia he pulled over the RV because the RV got on the fog line. Corporal Coleman intended to run a license and registration check. At the hearing, he admitted to the Court that he in fact did not run a check of this information.

Corporal Coleman asked Mr. Demilia to explain the purpose of his trip. Mr. Demilia said that he was returning from a week-long trip to visit friends in Colorado. He claimed the RV was his and that Mr. Derrick was his friend. He and Corporal Coleman talked about employment, with Mr. Demilia saying he was a computer consultant and that Mr. Derrick managed bands and does "band stuff" (Dkt. No. 63 at 2). Corporal Coleman claims that he believed Mr. Demilia was a little nervous sitting in the patrol car. Corporal Coleman had a warning ready for Mr. Demilia to sign but moved the warning away so that Mr. Demilia could not sign it.

Corporal Coleman proceeded to ask Mr. Demilia whether he had anything illegal in the RV. Mr. Demilia indicated he did not, and Corporal Coleman recalled Mr. Demilia claiming something to the effect of he "left it at home." Corporal Coleman then asked Mr. Demilia if he could "check the vehicle." The government in its response to the motion to suppress claims that Corporal Coleman asked, "If I wanna check everything and make sure it's okay, it's alright with you?" (Dkt. No. 63 at 2). Mr. Demilia did not respond initially, and Corporal Coleman repeated the request. According to the government, he asked, "[i]t's okay with you if we check and make sure everything's okay?" (Dkt. No. 63 at 2). Mr. Demilia responded affirmatively to the second request.

Corporal Coleman testified that he suspected there might be criminal activity and that the traffic stop developed quickly. When pressed about this, Corporal Coleman claimed that he suspected criminal activity because, in his view, it took some time for the RV to pull over during the traffic stop, he has observed a trend of individuals bringing marijuana back from Colorado

where it is legal, there were two unrelated men traveling together in an RV, and Mr. Demilia appeared a little nervous during the stop. Corporal Coleman also offered that, during a recent prior stop he made, an older male and younger male were traveling in an RV from the West transporting marijuana.

When pressed on cross examination, Corporal Coleman acknowledged that, from where he was driving his patrol car during the time his blue lights were activated, he could not see the rear view mirrors of the RV, and the RV had no rear windows. He acknowledged on cross examination he suspected the driver of the RV could not see him before he crossed over into the left lane. He also acknowledged that, once he crossed over into the left lane, the RV began to pull over. He conceded that, during the stop, he told Mr. Demilia that he "got up on the fog line." Corporal Coleman did not mention the rumble strip or crossing the fog line during the stop. He acknowledged that it was a large RV, subject to wind and likely more difficult than a truck to drive and steer. He estimated the RV's speed at 60 miles per hour and claimed he followed the RV for approximately five miles before activating his blue lights.

Corporal Coleman acknowledged that, during interdiction training, he has been advised to be very specific and detailed when preparing a report. He claims all information is in his report. He admitted he did not know there were two men in the RV when he made the stop. He did not know the men were traveling from Colorado when he made the stop. He acknowledged that many people are nervous in a patrol car, although he claimed during his testimony that this was different. Corporal Coleman's report, however, states only that Mr. Demilia was a "little nervous" and lists no details to describe how this was different, such as a bulging carotid artery, excessive sweat, or shaking hands on the part of Mr. Demilia. The report does state that Corporal Coleman put the warning down, and he admitted during his testimony that he put the

warning down so that Mr. Demilia could not sign it because he intended to ask for consent to continue the stop.

During his search of the RV, Corporal Coleman located marijuana. He returned to the patrol car and advised Mr. Demilia that he was under arrest. At that point, Mr. Demilia claimed that Mr. Derrick knew nothing about it.

At the hearing on the motion to suppress, Corporal Coleman was questioned by counsel for the government and testified that he relied for the stop on Ark. Code Ann. § 27-68-103. On cross examination, Corporal Coleman denied having received any other information from any law enforcement agency or information center concerning alleged vehicles coming through the area he was patrolling that day; he testified the traffic stop was strictly because of that particular statutory violation. In fact, Corporal Coleman conceded that there are a lot of things that could be considered "lane use" but that, when he hit the blue lights, he thought the RV was violating specifically Ark. Code Ann. § 27-68-103. At no point did Corporal Coleman testify that he was relying on Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302 for the stop. He did not mention, and was not questioned about, Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302 until redirect. Even then, counsel for the government claimed Corporal Coleman was not relying on Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302 to justify his traffic stop; Corporal Coleman did not have those statutes in mind when he wrote "lane use" as the alleged violation. Counsel for the government, in an exchange with the Court, represented that the government was not going to contend that Mr. Demilia or Mr. Derrick violated Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302.

After the hearing, the government filed a motion to supplement the record (Dkt. No. 83). The government states in its motion that, in its initial responses to defendants' motions to

suppress, the government argued the traffic stop was supported by a violation of "Arkansas Code Annotated, Section 27-51-302 and/or Section 27-68-103." However, the government claims that, "[d]uring an exchange with the Court, the United States mistakenly stated that it was not asserting Section 27-51-302 as the basis for the traffic stop in this case" (Dkt. No. 83 at 2). In its motion, the government appears to argue Ark. Code Ann. § 27-51-302 as a basis for the stop, despite Corporal Coleman's testimony under oath to the contrary and counsel for the government's statement to the Court at the hearing disavowing reliance on this statute.

### B.  Analysis

#### 1.  The Traffic Stop

##### a.  Objective Reasonableness Of The Traffic Stop

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention is quite brief. *Brendlin v. California*, 551 U.S. 249, 255–56 (2007); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001). A stop of the driver of a vehicle results in a seizure under the Fourth Amendment of all occupants of the vehicle. *Brendlin*, 551 U.S. at 255–56. A traffic stop is legal under the Fourth Amendment if it is supported by probable cause to believe that a violation of law has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). In making this assessment, the Court must disregard the officer's subjective intent which plays "no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813.

It is well-established that a traffic violation, however minor, creates probable cause to stop the driver of a vehicle. *See United States v. Beck*, 140 F.3d 1129, 1133 (8th Cir. 1998) (citations omitted). Although probable cause requires articulable facts, it does not require that

the officer making the traffic stop cite a specific rule of law, nor does "[t]he mere fact an incident report omits certain details . . . render the officer's testimony concerning the underlying action facially implausible." *United States v. Mendoza*, 677 F.3d 822, 828 (8th Cir. 2012). In *Mendoza*, the arresting officer's report described the justification for probable cause as the driver making "random turns and stops" in addition to "not signaling . . . and driving erratically." *Id.* at 827–28. Despite not invoking specific statutory violations of the traffic code, the Eighth Circuit determined the officer's description of the conduct aligned with the alleged statutory violation and, therefore, the officer's observations created probable cause. *Id.* at 828.

The Court examines first whether the initial traffic stop of the RV was reasonable. From the record before it, if the Court credits Corporal Coleman's testimony, because the driver of the RV crossed over the fog line onto the rumble strip more than one time, Corporal Coleman initiated a traffic stop. Those were the only facts known to Corporal Coleman at the time of the initial traffic stop. Mr. Demilia contends he did not touch the fog line and did not drive on the line. Corporal Coleman told Mr. Demilia when he pulled him over that "he went up onto the fog line" as a justification for the stop. The Court must determine whether, on this record, Corporal Coleman's belief that Mr. Demilia was violating the law at the time of the traffic stop was objectively reasonable. *See United States v. Thomas,* 93 F.3d 479, 485 (8th Cir. 1996) ("Probable cause exists where an officer objectively has a reasonable basis for believing that the driver has breached a traffic law."). The Court concedes that the government, from the way it has presented its legal arguments and proof, has complicated the record. The Court notes that Corporal Coleman has not testified inconsistently, but the government's counsel appears to have changed positions.

Corporal Coleman testified that he relied on Ark. Code Ann. § 27-68-103 to make the traffic stop. He denied having received any other information from any law enforcement agency or information center concerning alleged vehicles coming through the area he was patrolling that day; he testified the traffic stop was strictly because of the one statutory violation. He acknowledged that there are a lot of things that could be called "lane use," which is the violation he wrote in his report, but that, when he hit the blue lights, he thought the RV was violating specifically Ark. Code Ann. § 27-68-103.

The Court thus begins its analysis with Ark. Code Ann. § 27-68-103. This statute provides:

(a) It is unlawful for any person:

    (1) To drive a vehicle over, upon, or across any curb, central dividing section, or other separation or dividing line on controlled-access facilities;

    (2) To make a left turn or a semicircular or U-turn except through an opening provided for that purpose in the dividing curb section, separation, or line;

    (3) To drive any vehicle except in the proper lane provided for that purpose and in the proper direction and to the right of the central dividing curb, separation section, or line; or

    (4) To drive any vehicle into the controlled-access facility from a local service road except through an opening providing for that purpose in the dividing curb or dividing section or dividing line which separates the service road from the controlled-access facility proper.

(b) Any person who violates any of the provisions of this section shall be guilty of a misdemeanor. Upon arrest and conviction that person shall be punished by a fine of not less than five dollars ($5.00) nor more than one hundred dollars ($100) or by imprisonment in the city or county jail for not less than five (5) days nor more than ninety (90) days, or by both fine and imprisonment.

The law upon which Corporal Coleman purports to rely for the stop addresses the design and regulation of access to controlled-access facilities, including interstate highways. Defendants challenged the application of this statute to the facts presented during cross

examination of Corporal Coleman and challenged the logic of Corporal Coleman's reliance upon this statute in their post-hearing brief (Dkt. No. 82). Corporal Coleman specifically testified that he relied upon Ark. Code Ann. § 27-68-103(a) in this instance, determining that "dividing line" in the statute includes fog line. Defendants challenge this interpretation of the statute. Defendants further maintain that the limited authority from other jurisdictions that addresses statutes such as Ark. Code Ann. § 27-68-103 "indicates that the purpose is to prevent individuals from driving across the median or other dividing indicators towards the lanes of oncoming traffic" (Dkt. No. 82 at 3). Counsel for the government argued in closing at the hearing that crossing onto the fog line violates Ark. Code Ann. § 27-68-103, although the government makes no response to the merits of defendants' post-hearing brief.

To determine whether this statute was intended to apply to the conduct at issue, the Court first looks to Arkansas courts for guidance. There appears to be no Arkansas law on point. When there is no state law construing a state statute, a federal court must predict how the state's highest court would interpret the statute. Alternatively, the Court could abstain from deciding the issue or certify it to the Arkansas Supreme Court for resolution. Where a complaint raises federal claims which may be avoided by the state court's definitive ruling on a state law issue, a court may abstain. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). Alternatively, most states including Arkansas, have adopted certification procedures which allow federal courts faced with an unclear issue of state law to certify the question directly to the State's highest court for resolution. In Arkansas, certification is only appropriate for "questions of Arkansas law which may be determinative of the cause then pending in the certifying court . . . ." Ark. Sup. Ct. R. 6-8. This Court concludes that the state law clarification of the statute in question will not make a federal court ruling unnecessary.

Therefore, this Court will predict how the Arkansas Supreme Court would construe this statute.  Arkansas law requires that criminal statutes be strictly construed and that all doubts be resolved in favor of the accused.  *Manning v. State*, 956 S.W.2d 184, 186 (Ark. 1997).  The statute, strictly construed, addresses lane use on a divided highway, not the fog line when two lanes of traffic are traveling in the same direction.  This Court predicts the Arkansas Supreme Court would so hold.

Alternatively, if the Arkansas Supreme Court were to hold that the statute applies to the fog line when two lanes of traffic are traveling in the same direction, the Court would have to determine whether Ark. Code Ann. § 27-68-103 was unconstitutionally applied to defendants in this case.  "A statute is vague when the conduct it forbids is not ascertainable.  People of common intelligence cannot be required to guess at the meaning of the enactment."  *Hill v. Colorado*, 530 U.S. 703, 774 (2000) (internal citations omitted).  "To defeat a vagueness challenge, a penal statute . . . must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement."  *United States v. Berger*, 553 F.3d 1107, 1110 (8th Cir. 2009).  This Court would have to conclude that Ark. Code Ann. § 27-68-103 fails to provide citizens with adequate notice that driving onto the fog line violates this law.

For these reasons, the Court concludes that Corporal Coleman made a mistake of law when he initiated a traffic stop on these facts for purportedly violating Ark. Code Ann. § 27-68-103.  In the Eighth Circuit, when a police officer "makes a traffic stop based on a mistake of law, the legal determination of whether probable cause or reasonable suspicion existed for the stop is judged by whether the mistake of law was an objectively reasonable one."  *United States v. Washington*, 455 F.3d 824, 827 (8th Cir. 2006) (citations omitted).  As this Court has previously observed, "[t]he Eighth Circuit appears to be a minority of one on this issue.  All other Circuits

to consider the issue hold that a police officer's mistake of law can never be objectively reasonable." *Giron v. City of Alexander*, 693 F.Supp.2d 904, 948 and n.234 (E.D. Ark. 2010) (citing cases from other circuits that adopt the majority position). There are many reasons why the minority view has been criticized:

> First, such a rule removes any incentive for police to make sure that they properly understand the law that they are entrusted to enforce and obey. Second, it is fundamentally unfair to hold citizens to the traditional rule that ignorance of the law is no excuse while allowing those entrusted to enforce the law to be ignorant of it. Finally, . . . if officers are allowed to stop vehicles based upon their subjective belief that traffic laws have been violated even when no such violation has, in fact, occurred, the potential for abuse of traffic infractions as pretext for effecting stops seems boundless and the costs to privacy rights excessive.

*Id.* at 949 (internal citations and quotations omitted).

While the Court acknowledges that criticism, the Court concurs that "[a]s strongly as this court may believe that the majority view is sounder, it is obligated to apply the law of the Eighth Circuit." *Id.* Therefore, the Court must determine whether Corporal Coleman's belief that defendants were violating Ark. Code Ann. § 27-68-103 was objectively reasonable.

"[T]he validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one." *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005). "In making such analysis, courts have focused on whether there is any evidence of police manuals or training materials, state case law, legislative history, or any other state custom or practice that would create some objectively reasonable basis for the traffic stop. This list appears non-exhaustive." *Giron*, 693 F.Supp.2d at 949 (citations omitted). "Where there is a basis in state law for an officer's action and some ambiguity or state custom that caused the officer to make the mistake, it may be objectively reasonable. However, in the absence of such evidence, officers cannot act upon misunderstandings of clear statutes or, worse yet, their

own notions of what the law ought to be." *United States v. Washington*, 455 F.3d 824, 828 (8th Cir. 2006).

In other words, there must be some objective basis—outside the officer's subjectivity—in order for an officer's mistake of law to be objectively reasonable. *See, e.g.*, *Id.* at 827–28 (rejecting the objective reasonableness of the stop when the statute cited by the officer as a basis for the stop did not prohibit the conduct the officer thought it did, the government conceded that no other motor statute or ordinance forbade the conduct cited, and the government failed to present any evidence of police manuals or training materials, state case law, legislative history, or any other state custom or practice that would create some objectively reasonable basis for the traffic stop). In contrast, when there is a basis for the mistaken belief, courts have determined that the officer's mistake of law was objectively reasonable. *See, e.g.*, *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005) (determining that an officer's belief that operating a vehicle with one non-functioning brake light violated a particular provision of tribal law was objectively reasonable, appearing to base the decision primarily upon the fact that the statute in question was "counterintuitive and confusing").

Nothing was presented by the government to lead this Court to determine Corporal Coleman's mistake of law was objectively reasonable. The government cited no police manuals or training materials, state case law, legislative history, or any other state custom or practice that would create some objectively reasonable basis for attributing this traffic stop to Ark. Code Ann. § 27-68-103. The Court acknowledges that Corporal Coleman testified that, in the last year, he has written several tickets for "lane use" relying on Ark. Code Ann. § 27-68-103. This Court determines that Corporal Coleman's personal past practice in writing tickets, unsanctioned or

approved of by any State or officer-training entity, cannot serve to create an objectively reasonable basis.

### b. Validity Of *Post-Hoc* Statutory Justifications For The Stop

This Court must next consider whether probable cause to stop defendants for another statute, explicitly disclaimed as the basis for the stop at the hearing by both Corporal Coleman and government counsel, suffices to justify the stop. This Court acknowledges language in *United States v. Guevara*, 731 F.3d 824, 828–29 (8th Cir. 2013), examining defendant's argument that, where the officer cited one statute to defendant when he pulled her over and another statute to support the stop at the hearing on defendant's motion to suppress, the officer's mistake of law made the stop invalid. In that case, the district court determined that the officer had a reasonable suspicion that some traffic violation had occurred at the time he stopped the vehicle. *United States v. Guevara*, No. 11-00135, 2012 WL 553356, at *3 (D. Neb. Feb. 21, 2012), *aff'd in part*, 731 F.3d 824 (8th Cir. 2013) and *aff'd in part*, 13-2446, 2013 WL 6017341 (8th Cir. Nov. 14, 2013). The Eighth Circuit explained that "[t]he district court found that all that was required in this case was a reasonable suspicion that *some* traffic violation occurred. The court held that the trooper did not need to be correct that a law had been broken, or even correct about which law had been broken, provided his mistake in law or fact was objectively reasonable." 731 F.3d at 828 (internal citations and quotations omitted). On review, the Eighth Circuit determined that:

> Even if [defendant's contention that the district court relied on a different statute than the one the officer cited to defendant when he pulled her over] were true, it does not necessarily answer the question of whether Trooper Lewis had the probable cause or reasonable suspicion necessary to make the stop. "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (citing *Whren v. United States,* 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). "That is to say, his subjective

reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* The record shows that Trooper Lewis observed Guevara driving in the left lane and failing to move over to the right lane for faster moving cars. Trooper Lewis even told Guevara that she could not simply drive slowly in the left lane, forcing cars to pass her on the right. Under *Devenpeck* and *Whren,* Trooper Lewis had the probable cause necessary to make the traffic stop for improperly driving in the left lane, a reason he did articulate to Guevara at the time of the stop.

*Id.* at 828–29. *See also United States v. Robledo*, 185 F. App'x 556, 557–58 (8th Cir. 2006) (examining a mistake of law and fact claim by defendant and upholding the reasonableness of the stop after determining the officer's belief was reasonable).

If the rationale of *Guevara* controlled, because Corporal Coleman observed the RV cross onto or over the fog line and told Mr. Demilia when he pulled him over that he went up onto the fog line as a justification for the stop, Corporal Coleman had the probable cause necessary to make the traffic stop. His subjective reason for making the arrest need not have been the criminal offense as to which the known facts provide probable cause. The known facts arguably appear to provide probable cause based on the holding in *United States v. Pulliam*, 265 F.3d 736 (8th Cir. 2001), and Ark. Code Ann. § 27-51-302, although defendants do not agree.

In regard to traffic stops premised on crossing the fog line, the Eighth Circuit has observed:

Federal courts of appeals, including this one, have reached different conclusions on the objective reasonableness of traffic stops based [on statutes requiring that a vehicle "be driven as nearly as practical entirely within a single lane"], depending on the particular circumstances of each case. *Compare United States v. Herrera Martinez,* 354 F.3d 932, 933–34 (8th Cir. 2004) (per curiam) (concluding that the officer had probable cause to make a traffic stop where the officer observed no other traffic violations than a single fog-line crossing); *United States v. Pulliam,* 265 F.3d 736, 739 (8th Cir. 2001) (concluding that a traffic violation had occurred where the officer observed the driver drift over the fog line twice in two miles); *United States v. Alvarado,* 430 F.3d 1305, 1309 (10th Cir. 2005) (holding that an officer had a reasonable, articulable suspicion that the driver had committed a traffic violation where the defendant briefly crossed the fog line once and failed to point to any objective factor that might have interfered with his ability to keep his

vehicle in a single lane; noting particularly the absence of any adverse weather or road conditions that would necessitate crossing the line); *United States v. Zabalza,* 346 F.3d 1255, 1258 (10th Cir. 2003) (concluding that the officer had "more than the necessary objectively reasonable, articulable suspicion" that the driver had committed a traffic violation where he observed the vehicle cross the center line twice), *with United States v. Gregory,* 79 F.3d 973, 978 (10th Cir. 1996) (finding no reasonable suspicion based on an isolated incident of a vehicle crossing the fog line where the road was winding and mountainous and the weather condition was windy); *United States v. Freeman,* 209 F.3d 464, 466 (6th Cir. 2000) (finding no probable cause based on single incident of a large motor home crossing the fog line for a few feet).

*United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109–10 (8th Cir. 2007).

In *Pulliam*, a fog line case, the Eighth Circuit determined that there was probable cause for a traffic stop when the driver was stopped for drifting over the fog line twice in two miles and the statute the officer relied upon for the stop was Ark. Code Ann. § 27-51-302, which provides that "[a] vehicle shall be driven as nearly as practical entirely within a single lane . . . ." 265 F.3d at 739 (discussing *United States v. Barberena-Jimenez,* 1996 WL 83002, at *2 (8th Cir., Feb. 28, 1996) (where defendant was observed crossing over the fog line several times the Court explained: "The evidence indicates that Barberena did not maintain his automobile in a single lane of traffic. This constitutes an offense in Arkansas.")).

This Court, however, is not convinced that the rationale of *Guevara* controls here so as to make the stop objectively reasonable. There are distinctions between the facts presented here and the facts reported in *Guevara*. Here, Corporal Coleman took the stand at the hearing on the motion to suppress and testified he made the stop based on Ark. Code Ann. § 27-68-103, with no qualifying language or hesitation. Later at the same hearing on the motion to suppress, counsel for the government was asked by the Court whether there was any contention by the government that Mr. Demilia or Mr. Derrick violated Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302, and counsel for the government responded that the government did not contend either

defendant violated those statutes. In *Guevara*, the trooper "did not testify to a specific statute as the basis for the traffic stop . . . ." 731 F.3d at 828 (internal citations and quotations omitted). This Court acknowledges he was not required to do so, but Corporal Coleman opted to do so in the instant case.

In its motion to supplement the record, the government appears to seek to reassert Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302 as a basis for the stop. Defendants object to the government's motion to supplement the record, contending that the government has provided no reasonable explanation for failing to present at the hearing the argument that the stop was based on Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302, other than to claim "mistake" with no further explanation, and because defendants contend there is resulting prejudice in that the questions posed to Corporal Coleman were done on the premise that the government was only asserting a violation of Ark. Code Ann. § 27-68-103, as represented at the hearing. Defendants contend they neither argued to the Court nor questioned Corporal Coleman regarding an alleged violation of Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302. The Court agrees. The government in its motion to supplement the record is not merely citing case law or arguing in support of a previously made contention. It instead seeks to inject into the Court's consideration an issue that is not supported by Corporal Coleman's testimony and that counsel for the government abandoned or waived at the hearing. In this Court's view, counsel for the government seeks to make the argument, *post hoc*, that Corporal Coleman could have based his traffic stop on Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302, even though Corporal Coleman testified he did not and counsel for the government took the position at the hearing on the motion to suppress that the government would not contend defendants violated those statutes.

The suggestion of Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302 as a possible basis for the stop first surfaced in the government's response to the motions to suppress filed with this Court. Corporal Coleman did not testify to any thought or belief that a violation of Ark. Code Ann. § 27-51-301 or Ark. Code Ann. § 27-51-302 occurred. It appears to the Court that the government is putting forward these statutes as authority Corporal Coleman *could have used* to stop the vehicle if he had thought of them and then to argue that this statutory authority, explicitly disclaimed as the basis for the stop at the hearing by both Corporal Coleman and government counsel, justified the stop.

This Court is not inclined to entertain such an argument here for two reasons. First, citing this statutory authority as justification for the stop runs counter to the evidence in the record before the Court, especially Corporal Coleman's testimony. Second, this argument was abandoned or waived by counsel for the government at the hearing on the motion to suppress. The Court will not now permit the government, after the close of proof, to reopen the record to resurrect an argument it abandoned or waived.

For these reasons, the Court finds Corporal Coleman's stop of defendants unconstitutional under the Fourth Amendment.

### 2.      Expansion Of Detainment And Questioning

Mr. Demilia also argues that Corporal Coleman unconstitutionally expanded his detainment and questioning. If a legal traffic stop has occurred, the officer initiating the stop may: (1) conduct an investigation reasonably related to the circumstances giving rise to the stop, (2) ask routine questions regarding the purpose of the trip, destination, route, and whether the officer may search the vehicle, and (3) perform routine tasks related to the traffic violation such as computerized checks of the car's registration, the driver's license, and the driver's criminal

history or writing and issuing a ticket or citation.  *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010) (citations omitted).  At a certain point, however, when the detainment and questioning expands beyond the initial scope of the traffic stop and moves into other territory, the stop can become an unconstitutional seizure. *See, e.g.*, *id.*

"To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010) (internal quotations omitted).  There is no specific bright line test for whether the officer's suspicion was reasonable enough under the circumstances to expand the search, with courts instead weighing the totality of the circumstances as they would appear to an experienced police officer in a similar situation. *See United States v. Jones*, 269 F.3d 919, 926–27 (8th Cir. 2001).  Although there are no absolute standards for what does or does not constitute reasonable suspicion, there must be "more than an inchoate hunch" and the police officer must "articulate some minimal, objective justification for an investigatory stop."  *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (internal quotations omitted).

A number of Eighth Circuit decisions provide guidance as to what type of facts must be present to provide an officer with reasonable suspicion so as to expand his questioning beyond the scope of the traffic stop.   The most common of these facts, usually occurring contemporaneously in a single stop, include unusual nervousness, sweating, stuttering, conflicting stories between driver and passenger, and vagueness or uncertainty regarding destination and purpose.  *See United States v. Quintero-Felix*, 714 F.3d 563, 568 (8th Cir. 2013); *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012); *Bracamontes*, 614 F.3d at 816; *United*

*States v. Ehrmann*, 421 F.3d 774, 781 (8th Cir. 2005). Other times, officers will provide more specific factual observations that, coupled with their experience, become sufficient reasons to expand the scope of the stop. *See United States v. Bowman*, 660 F.3d 338, 345 (8th Cir. 2012) (where officer's reasonable suspicion was aroused by tinted windows, recent registration of vehicle, excessive air freshener, and an unusual amount of cell phones in the car); *United States v. Ward*, 484 F.3d 1059, 1062 (8th Cir. 2004) (where a patriotic magnet, new lock on a U-Haul, Drug Enforcement Administration hat, inconsistent Immigration and Naturalization Service and Department of Homeland Security credentials, and nervousness were enough to raise a reasonable suspicion).

Although some leeway is often given to officers in the light of their experience dealing with drug-related offenses, there are several cases where the traffic stop became unconstitutional because the totality of the circumstances was not enough to justify expanding the scope. In *United States v. Beck*, the totality of circumstances included: (1) a rental car rented by an absent third party, (2) a car licensed in California, a known drug source state, (3) fast food trash littered in the car, (4) no visible luggage, (5) a nervous demeanor, (6) a trip from a drug source state to a drug demand state, and (7) the officer's disbelief as to the purpose of the trip. 140 F.3d 1129, 1137 (8th Cir. 1998). The court held that these circumstances were not enough to justify expanding the scope of the traffic stop because "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Id.* (internal quotations omitted). Additionally, while nervousness paired with several other suspicious factors or extremely unusual nervousness can justify expanding the scope of a stop, in general "nervousness is of limited significance in determining reasonable suspicion" because it is natural and common for even innocent people to become

nervous around officers during a traffic stop.  *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (internal citations and quotations omitted).

In analyzing the facts of this matter, Corporal Coleman testified that he suspected there might be criminal activity and that the traffic stop developed quickly.  When pressed about this, Corporal Coleman claimed that he suspected criminal activity because, in his view, it took some time for the RV to pull over during the traffic stop, he has observed a trend of individuals bringing marijuana back from Colorado where it is legal, there were two unrelated men traveling together in an RV, and Mr. Demilia appeared anxious and nervous during the stop.  Corporal Coleman also offered that, during a prior stop he made, an older male and younger male were traveling in an RV from the West and transporting marijuana.  These facts taken together do not rise to the level of reasonable suspicion, as they are much more in line with the conglomeration of innocent factors found in *Jones* and *Beck*.

However, "where a seizure of a person is based on probable cause to believe that a traffic violation was committed, an officer does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention."  *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007).  Here Corporal Coleman only expanded the scope to include a single question about possible illegal items in the RV before he sought consent to search the vehicle.  In fact, the request to search the RV came only 90 seconds after the routine questioning of Mr. Demilia began, with the entire ordeal from stop to arrest only lasting a total of eight minutes.   Although the facts of the situation were not sufficient to give rise to an expansion in time and scope of the stop, the Court determines that, were the initial traffic stop of Mr. Demilia based on probable

cause, Corporal Coleman's single question expanding the time and scope of the stop, briefly extending the length of the traffic stop would not render the detainment unconstitutional.

### 3. Consent To Search The Vehicle

Mr. Demilia's third claim is that he did not knowingly and voluntarily consent to the search because Corporal Coleman asked if he could "check to see if the vehicle was okay." Mr. Demilia claims he did not equate that request with a request to search. The government bears the burden of proving voluntary consent to search by a preponderance of the evidence. *United States v. Czeck*, 105 F.3d 1235, 1239 (8th Cir. 1997). Voluntarily-obtained consent obviates the need for government officials to obtain a search warrant before conducting a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Eighth Circuit examines 11 factors, as set forth in *United States v. Chaidez*, and the totality of the circumstances to determine whether consent given was voluntary. 906 F.2d 377 (8th Cir. 1990). The *Chaidez* factors include the age, intelligence, and mental state of the person giving consent; the nature of the detainment including the number of police officers involved, the level of custody, and the place of detainment; and the prior experience of the person from whom consent is requested which might establish a more voluntary or knowing consent. *Id.* at 381. Applying these factors to the case at hand, there was only one officer involved—Corporal Coleman, Mr. Demilia was seated in the patrol car when he was asked for consent, and the stop was only a few minutes long at the point consent was requested.

The Court must resolve whether Mr. Demilia intended to consent to a search of the RV or just a safety-check of some kind. The Court admittedly is troubled by Corporal Coleman's failure to use the word "search" when asking for voluntary consent to search the RV, given the Fourth Amendment considerations at stake in the exchange. Even with that, the Court must

examine the record before it based on controlling law. The parties do not dispute what Corporal Coleman asked or the words he used.

In general terms, "the scope of a consensual search is measured by what the typical reasonable person would have understood by the exchange." *United States v. Brown*, 345 F.3d 574, 580 (8th Cir. 2003) (internal quotations omitted). Additionally, the scope of a search is generally defined by its "expressed object," which in the instant case would be to "check and make sure everything is okay." *United States v. Ferrer-Montoya,* 483 F.3d 565, 568 (8th Cir. 2007) (citing *Florida v. Jimeno,* 500 U.S. 248, 251 (1991)). While a reasonable person might not expect a request to "check and make sure everything is okay," standing on its own as a request, to include a request to search the vehicle, the Court reaches the conclusion that the request here included a request to search the vehicle given that the parties do not dispute that the immediately preceding question was, "Nothing illegal in the RV today?" Considering the totality of the circumstances, the Court determines that on these facts, Mr. Demilia knew that he was consenting voluntarily to a search of the RV.

### 4. Fruit Of The Poisonous Tree

At this point in the Court's analysis, to resolve the motion to suppress, the Court must determine if the evidence sought to be suppressed is the direct result of the unconstitutional traffic stop or whether Mr. Demilia's intervening consent was an independent, lawful cause of the search and seizure. "An illegal detention is only the start, and not the end, of [the Fourth Amendment] analysis, for the evidence seized from [defendants] and their vehicle need not be suppressed if their voluntary consent provided an independent basis for the search." *United States v. Esquivel*, 507 F.3d 1154, 1158–59 (8th Cir. 2007) (citations omitted). That determination involves asking whether "granting establishment of the primary illegality, the

evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1965) (citations omitted). Subsequent voluntary consent to search may purge the taint of the illegal traffic stop, but a voluntary consent to search, "preceded by an illegal police action, does not automatically purge the taint of an illegal detention." *United States v. Barnum*, 564 F.3d 964, 971 (8th Cir. 2009) (citations omitted). Thus, although this Court found voluntary consent on the part of Mr. Demilia, that consent is not enough. Mr. Demilia's consent must also have been an "independent, lawful cause" of the search. *See Esquivel*, 507 F.3d at 1160.

To determine whether voluntary consent is "an independent, lawful cause of the search," the Court must consider: "(1) the temporal proximity between Fourth Amendment violation and grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the officer's Fourth Amendment violation." *Barnum*, 564 F.3d at 971 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

In considering the first *Brown* factor, the temporal proximity between the Fourth Amendment violation and the grant of consent to search, the Court notes that "the closer this period, the more likely the defendant's consent was influenced by, or the product of, the police misconduct." *Id.* at 972 (citing *United States v. Simpson*, 439 F.3d 490, 495 n. 3 (8th Cir. 2006)). Here, the record indicates that Mr. Demilia gave his consent to search the vehicle about three and a half minutes after the traffic stop, with the entire ordeal from stop to search to arrest and seizure lasting only a total of eight minutes. While the Eighth Circuit has held that a period of about nine minutes between stop and consent is enough to purge the taint of any illegality, it has not held that a matter of a few minutes would do the same. Thus, considering the first *Brown*

factor, the short time between the traffic stop and Mr. Demilia's consent, slightly favors defendants.

Under the second *Brown* factor, the presence of any intervening circumstances, the Court recognizes "that an intervening circumstance between the Fourth Amendment violation and the defendant's consent indicates that the consent was made of the defendant's free will and that the officer was not attempting to exploit an illegal situation." *Id.* (citations omitted). Such intervening circumstances in this situation would include returning the defendant's license and vehicle paperwork or telling the defendant that the stop was over. *See Id.* at 972–73; *Esquivel*, 507 F.3d at 1160; *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006). Those circumstances do not exist here. The record indicates that Corporal Coleman had not yet run a check on Mr. Demilia's license and registration, that he moved the warning away from Mr. Demilia so that Mr. Demilia could not sign it while Corporal Coleman continued to question him, and there is no indication that Corporal Coleman suggested to Mr. Demilia that he was free to go. In fact, as Mr. Demilia was in Corporal Coleman's vehicle, it is clear to the Court that Mr. Demilia was not free to go. Thus, considering the second *Brown* factor, the absence of any intervening circumstances between the traffic stop and Mr. Demilia's consent, favors defendants.

Finally, with respect to the third *Brown* factor, the purpose and flagrancy of the officer's Fourth Amendment violation, "[a] Fourth Amendment violation may be purposeful or flagrant under various circumstances, including where the violation was investigatory in design and purpose and executed in the hope that something might turn up." *Barnum*, 564 F.3d 964, 973 (8th Cir. 2009) (citations omitted). As in *Barnum*, this Court finds that a reasonable view of Corporal Coleman's testimony supports a finding that he did not act purposefully or flagrantly by initiating the illegal traffic stop. *See id.* According to his testimony, Corporal Coleman denied

having received any other information from any law enforcement agency or information center concerning alleged vehicles coming through the area he was patrolling that day; he testified the traffic stop was strictly because of the RV's crossing the fog line, which he believed was a violation of Ark. Code Ann. § 27-68-103. Although Corporal Coleman's belief that crossing the fog line violated Ark. Code Ann. § 27-68-103 was objectively unreasonable, an unreasonable mistake of law or fact is not the type of "blatantly unconstitutional or flagrant behavior" condemned in *Brown*. *See id.*

Courts have found such blatantly unconstitutional and flagrant behavior where: "(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quoting *Brown*, 422 U.S. at 605).

There is no evidence in the record to suggest that Corporal Coleman knew his misconduct was improper and little evidence that he suspected defendants of drug use before he made the traffic stop. Corporal Coleman admitted he did not know that there were two men in the RV when he made the stop. He did not know the men were traveling from Colorado when he made the stop. Corporal Coleman's testimony suggests that he knew none of the facts he learned during his questioning of Mr. Demilia that suggested the possibility of contraband. The Court does not find reason in the record to believe that Corporal Coleman initiated the stop because of blatantly unconstitutional or flagrant behavior. Thus, the third *Brown* factor favors the government.

The Court, considering the three *Brown* factors together, finds that the short time between the stop and the voluntary consent given by Mr. Demilia, combined with the absence of any

intervening circumstance, when weighed against the absence of blatantly unconstitutional or flagrant behavior is not enough to purge the taint of the Fourth Amendment violation and to make Mr. Demilia's consent an independent, lawful cause of the search.

* * *

For the foregoing reasons, the Court grants defendants' motions to suppress (Dkt. Nos. 61, 78).

SO ORDERED this 3rd day of December, 2013.

_____
Kristine G. Baker
United States District Judge